Appeal No. 2015-1039

=========================================================

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

_____

RETIREMENT CAPITAL ACCESS MANAGEMENT COMPANY LLC.
*Appellant,*

v.

U.S. BANCORP,
*Appellee.*

_____

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. CBM2013-00014.

_____

**CORRECTED BRIEF FOR INTERVENOR – DIRECTOR OF
THE UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

NATHAN K. KELLEY
*Solicitor*

SCOTT C. WEIDENFELLER
*Senior Counsel for Patent Law and
Litigation*

LORE A. UNT
STACY B. MARGOLIES
*Associate Solicitors*

Office of the Solicitor-Mail Stop 8
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, Virginia 22313

March 25, 2015

*Attorneys for the Director of the
United States Patent and Trademark Office*

**Representative Claim**

1. A computerized method for creating a source of funds based on present value of future retirement payments, comprising the steps of:

    a.  designating an account in a depository for a beneficiary to receive future retirement payments payable to said beneficiary from a source of said retirement payments for a preselected period of time;

    b.  designating a benefit provider for providing a monetary benefit to said beneficiary;

    c.  authorizing said depository to periodically disburse a predetermined portion of said retirement payments deposited in said account to said benefit provider during said preselected period of time;

    d.  providing said monetary benefit to said beneficiary from said benefit provider based at least in part on present value of a designated portion of said future retirement payments without encumbering said beneficiary's right to said future retirement payments and without violating legislated proscriptions in the United States against alienation of future retirement benefits;

    e.  causing said future retirement payments to be deposited into said account throughout said preselected period of time;

    f.  causing said depository to transfer a portion of said retirement payments deposited into said account to said benefit provider during said preselected period of time; and

    g.  reimbursing said benefit provider from resources other than said future retirement payments if said transfer of a portion of said retirement payments from said depository to said benefit provider are curtailed prior to said end of said preselected period of time, and making said retirement payments available for the exclusive use of said beneficiary.

A33-34 (col. 8, l. 57 – col. 9, l. 24).

# TABLE OF CONTENTS

I.     STATEMENT OF THE ISSUES ....................................................................1

II.    STATEMENT OF THE CASE ......................................................................2

    A.     Statutory and Regulatory Background ..................................................3

        1.     Administrative Review of Issued Patents ....................................3

        2.     Post-Grant Review Procedures Under the AIA .........................4

        3.     Covered Business Method Review Procedures
             Under the AIA...............................................................................6

    B.     Factual Background............................................................................8

        1.     The '582 Patent:  Systems and Methods for Providing
             Recipients of Future Retirement Benefits With the Present
             Value of Their Benefits...............................................................8

        2.     The Board Decision ...................................................................12

III.   SUMMARY OF THE ARGUMENT .........................................................15

IV.    ARGUMENT.............................................................................................17

    A.     Standard of Review ........................................................................17

    B.     The Board May Consider Subject-Matter Eligibility Under
        Section 101 in a CBM Review.........................................................18

        1.     Judicial Precedent and the Language and Context of
             the Patent Act Provide That Section 101 Is a Ground for CBM
             Review ........................................................................................18

        2.     The Legislative History of the AIA Confirms That Congress
             Intended Section 101 as a Ground for CBM Review ...............23

        3.     Retirement Capital's Arguments Lack Merit ...........................26

C.    The Board Correctly Concluded That the Challenged '582 Patent
Claims Are Unpatentable Under the Abstract Idea Exception to
Section 101 ..........................................................................................31

    1.    Retirement Capital's Claims Do Not Satisfy the Alice
        Test ..........................................................................................31

    2.    Drafting Claims to a Machine, Rather Than a Process,
        Does Not Automatically Insulate Them From Section 101......37

    3.    No Additional Evidence Is Required to Determine That the
        Claims at Issue Are Directed to an Abstract Concept With
        Otherwise Routine Limitations .................................................39

    4.    The Existence of Non-Infringing Alternatives Does Not Save
        an Otherwise Abstract Claim From Section 101 ......................42

    5.    The Board Adequately Addressed All of the Claim
        Limitations ...............................................................................44

V.    CONCLUSION.............................................................................................45

# TABLE OF AUTHORITIES

## Cases

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
134 S. Ct. 2347 (2014) ................................................................. passim

*Am. Broadcasting Cos., Inc. v. Aereo, Inc.*,
134 S. Ct. 2498 (2014) ....................................................................21

*Aristocrat Techs. Australia PTY Ltd. v. Int'l Game Tech.*,
543 F.3d 657 (Fed. Cir. 2008) ..................................................... passim

*Auer* v. *Robbins*,
519 U.S. 452 (1997) ........................................................................17

*Bancorp Servs v. Sun Life Assur. Co. of Canada*,
687 F.3d 1266 (Fed. Cir. 2012) ................................................. 36, 44

*Benefit Funding Sys. LLC v. U.S. Bancorp*,
Case No: 1:12-cv-803-LPS (D. Del. filed June 22, 2012) ...................2

*Bilski v. Kappos*,
130 S. Ct. 3225 (2010) ................................................................. passim

*BRCA1- and BRCA2-Based Hereditary Cancer Test Patent Litigation*, *In re*,
774 F.3d 755 (Fed. Cir. 2014) ..................................................... 43-44

*buySAFE, Inc. v. Google, Inc.*,
765 F.3d 1350 (Fed. Cir. 2014) ................................................... 34-39

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*,
132 S. Ct. 1670 (2012) ............................................................... 19, 21

*Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ........................................................................17

*Content Extraction and Transmission v. Wells Fargo Bank, Nat'l Assn.*,
776 F.3d 1343 (Fed. Cir. 2014) ............................................ 21, 36, 40

*Cooper Techs. Co. v. Dudas*,
536 F.3d 1330 (Fed. Cir. 2008) .......................................................4

*Cuozzo Speed Techs., LLC,  In re,*
  –F.3d–, 2015 WL 448667 (Fed. Cir. 2015) ..................................................... 7, 18

*CyberSource Corp. v. Retail Decisions, Inc.,*
  654 F.3d 1366 (Fed. Cir. 2011) ............................................................. 34, 41, 42

*DDR Holdings, LLC v. Hotels.com, L.P.,*
  773 F.3d 1245 (Fed. Cir. 2014) .................................................................. 34, 38

*Dealertrack, Inc. v. Huber,*
  674 F.3d 1315 (Fed. Cir. 2012) .................................................................. passim

*Diamond v. Diehr,*
  450 U.S. 175 (1982) ............................................................................................29

*Digitech Image Techs. LLC v. Electronics for Imaging, Inc.,*
  758 F.3d 1344 (Fed. Cir. 2014) ........................................................................40

*Ferguson, In re,*
  558 F.3d 1359 (Fed. Cir. 2009) ........................................................................17

*Fort Properties, Inc. v. American Master Lease LLC,*
  671 F.3d 1317 (Fed. Cir. 2012) ........................................................................34

*Giegerich, In re,*
  396 F.2d 482 (CCPA 1968) ..............................................................................43

*Gottschalk v. Benson,*
  409 U.S. 63 (1972) ............................................................................................38

*Graham v. John Deere Co.,*
  383 U.S. 1 (1966) .................................................................................. 19, 26, 28

*Hamdan v. Rumsfeld,*
  548 U.S. 557 (2006) ..........................................................................................22

*Hibbs v. Winn,*
  542 U.S. 88 (2002) ............................................................................................23

*Kenna v. U.S. Dist. Court for the C.D. Cal.,*
  435 F.3d 1011 (9th Cir. 2006) ..........................................................................26

*Knapp-Monarch Co., In re*,
  296 F.2d 230 (C.C.P.A. 1961) ..............................................................42

*Lee*, *In re*,
  277 F.3d 1338 (Fed. Cir. 2002) ..........................................................42

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
  132 S. Ct. 1289 (2012) ................................................................ passim

*Myspace, Inc. v. GraphOn Corp.*,
  672 F.3d 1250 (Fed. Cir. 2012) ..........................................................31

*NTP, Inc., In re*,
  654 F.3d 1268 (Fed. Cir. 2011) ............................................................3

*Pennsylvania Department of Corrections v. Yeskey*,
  524 U.S. 206 (1998) ............................................................................27

*Planet Bingo, LLC v. VKGS LLC*,
  976 Fed. Appx. 1005 (Fed. Cir. 2014) ................................................39

*SSL Servs., LLC v. Citrix Sys., Inc.*,
  769 F.3d 1073 (Fed. Cir. 2014) ..........................................................18

*SmithKline Beecham Corp. v. Apotex Corp.*,
  439 F.3d 1312 (Fed. Cir. 2006) ..........................................................18

*State Street Bank and Trust Co. v. Signature Fin'l Group, Inc.*,
  149 F.3d 1368 (Fed. Cir. 1998) ................................................. 7, 8, 25

*Sullivan, In re*,
  362 F.3d 1324 (Fed. Cir. 2004) ..........................................................17

*Toibb v. Radloff*,
  501 U.S. 157 (1991) ............................................................................23

*Trainmen v. Baltimore & Ohio R.R. Co.*,
  331 U.S. 519 (1947) ............................................................................27

*Ultramercial, Inc. v. Hulu, LLC*,
  772 F.3d 709 (Fed. Cir. 2014) ..................................................... 21, 40

*Watts, In re,*
354 F.3d 1362 (Fed. Cir. 2004). .......................................................................40

*Zuber v. Allen,*
396 U.S. 168 (1969) ...............................................................................24

**Statutes**

5 U.S.C. § 706 ...............................................................................17

35 U.S.C. § 314 ...............................................................................18

35 U.S.C. § 100 ................................................................... 5, 19, 32

35 U.S.C. § 101 ...................................................................... passim

35 U.S.C. § 143 ...............................................................................2

35 U.S.C. § 282 .................................................................. 4-5, 12, 19

35 U.S.C. § 301 ...............................................................................3

35 U.S.C. § 303 ...............................................................................3

35 U.S.C. § 304 ...............................................................................3

35 U.S.C. § 311 ...........................................................................4, 5

35 U.S.C. § 312 ...............................................................................4

35 U.S.C. § 321 ............................................................... 4, 5, 18, 20

35 U.S.C. § 324 .................................................................... 6-7, 18

35 U.S.C. § 328 ...............................................................................6

35 U.S.C. § 329 ..........................................................................4, 6

35 U.S.C. §§ 311-318 ...................................................................4

American Inventors Protection Act, Pub. L. No. 106-113,
113 Stat. 1501, Sec. 4601-04 (1999) ...........................................4

Leahy-Smith America Invents Act  Pub. L. No. 112-29,
125 Stat. 284 (2011) ............................................................... passim

Pub. L. No. 96-517 Stat. 3015 (1980).........................................................................3

## Regulations

37 C.F.R. § 1.552 ...................................................................................................3

37 C.F.R. § 1.906 ................................................................................................3, 4

37 C.F.R. § 42.300 ................................................................................................6

## Legislative Materials

157 Cong. Rec. S1367 (Mar. 8, 2011) ................................................................ 7, 25

## Other Authorities

Fed. R. Evid. 201 ...............................................................................................42

H. Rep. No. 112-98 (2011) ............................................................................ passim

Joe Matal, *A Guide to the Legislative History of the America Invents Act: Part II of II*, 21 Fed. Cir. B.J. 539 (2012)......................................................... passim

## STATEMENT OF RELATED CASES

The Director is not aware of any other appeal in connection with this case that is currently pending in any other court.  U.S. Patent No. 6,625,582 is the subject of the following infringement litigation:

1. *Benefit Funding Sys., LLC v. Advance America, Cash Advance Centers, Inc.*, Case No. 1:12-cv-801-LPS (D. Del., filed June 22, 2012);

2. *Benefit Funding Sys., LLC v. Regions Financial Corp.*, Case No. 1:12-cv-802-LPS (D. Del., filed June 22, 2012);

3. *Benefit Funding Sys., LLC v. U.S. Bancorp*, Case No. 1:12-cv-803-LPS (D. Del., filed June 22, 2012).

This Court earlier affirmed a stay of the district court litigation in favor of the transitional post-grant review for the covered business method proceeding at issue in this case.  *Benefit Funding Sys. LLC v. Advance America Cash Advance Centers Inc.*, 767 F.3d 1383 (Fed. Cir. 2014).

This Court's decision in *Versata Development Group, Inc. v. SAP America, Inc. et al.*, No. 2014-1194, may directly affect, or be directly affected by, this Court's decision in this appeal.

# I.    STATEMENT OF THE ISSUES

U.S. Patent No. 6,625,582 is directed to methods and systems to pay retirees the present value of their retirement benefits. After a retiree decides to participate in the program, the retiree's benefit payments are designated to be paid into a deposit account for a preselected period of time. A portion of the benefits is also designated to be automatically paid to a funding source, such as a bank or insurance company. Then the funding source makes payments to the retiree based, at least in part, on the present value of the designated portion of the benefits. The funding source does not encumber the retiree's future benefits or violate U.S. laws against alienating the retiree's right to receive future benefits. If the retirement benefits are curtailed before the end of the preselected period of time, the funding source may be reimbursed by the retiree from resources other than the retirement benefits.

The Board found the claims unpatentable under 35 U.S.C. § 101 in a final written decision in a transitional post-grant review for a covered business method patent proceeding ("CBM review"). The Board determined that the claims are directed to the abstract idea of advancing funds based on future retirement payments, and the remaining elements are only conventional and routine. This appeal presents the following questions:

1

1.  Whether the Board lacked jurisdiction in a CBM review to determine patent eligibility under 35 U.S.C. § 101;[1] and

2.  Whether the Board correctly concluded that the challenged claims of the '582 patent are unpatentable under 35 U.S.C. § 101.

## II.    STATEMENT OF THE CASE

U.S. Patent No. 6,625,582 is assigned to Retirement Capital Access Management Company ("Retirement Capital").[2]  A25; A127.  Retirement Capital and its exclusive licensee, Benefit Funding Systems LLC, filed suit against U.S. Bancorp for infringement of the '582 patent in June 2012.  *Benefit Funding Sys. LLC v. U.S. Bancorp*, Case No: 1:12-cv-803-LPS (D. Del. filed June 22, 2012).  A43.  In response, U.S. Bancorp petitioned the Board for a CBM review of claims 1, 13, 14, 18, 30, and 31 on the grounds that the claims are directed to unpatentable subject matter under 35 U.S.C. § 101.  A37-38; A50-51; A72-78.

The Board instituted a CBM review, and, following a trial, entered a final written decision concluding that the challenged claims are unpatentable under 35 U.S.C. § 101.  A147-161; A1-22.  This appeal followed.  The Director of the USPTO intervened to defend the Board's decision.  *See* 35 U.S.C. § 143; Leahy-

---

[1]  The Director previously briefed this issue in *Versata Development Group, Inc. v. SAP America, Inc. et al.*, No. 2014-1194.

[2]  Citations to "Br. at __" refer to Retirement Capital's brief, and citations to "A__" refer to the Joint Appendix.

Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) (providing that covered business method patent review proceedings "shall be regarded as, and shall employ the standards and procedures of, a post-grant review under chapter 32 of title 35, United States Code," with exceptions not pertinent here).

### A.    Statutory and Regulatory Background

### 1.    Administrative Review of Issued Patents

Congress has long provided administrative mechanisms for third parties to ask the USPTO to reconsider the patentability of claims in an issued patent.  In 1980, Congress enacted the first statute authorizing ex parte reexamination.  *See* Pub. L. No. 96-517, 94 Stat. 3015 (1980) (codified at 35 U.S.C. ch. 30 (1980)). Congress specified that the USPTO could grant a request for reexamination only if it raised "a substantial new question of patentability" based on prior art patents and printed publications.  35 U.S.C. §§ 301, 303, 304 (1980).  Accordingly, the statute did not permit a third party to challenge a patent based on Sections 101 or 112, which do not turn on prior art patents or printed publications.  *Id.*; *see also* 37 C.F.R. § 1.552(a), (c).[3]

In 1999, Congress added an option for "inter partes" reexamination, which allowed the third-party requester to participate in the reexamination and, after

---

[3] Section 112, however, may be applied to subject matter added or amended during the reexamination.  37 C.F.R. § 1.552(a), (c); *see also In re NTP, Inc.*, 654 F.3d 1268 (Fed. Cir. 2011); 37 C.F.R. § 1.906(a), (c).

2002, any subsequent appeal.  American Inventors Protection Act, Pub. L. No.

106-113, 113 Stat. 1501, Sec. 4601-04 (1999) (codified as amended at 35 U.S.C.

§§ 311-318 (2000)); *see also Cooper Techs. Co. v. Dudas*, 536 F.3d 1330, 1332

(Fed. Cir. 2008); 37 C.F.R. § 1.906(a), (c).  Congress authorized the USPTO to

institute an inter partes reexamination, like an ex parte reexamination, only if the

request raised "a substantial new question of patentability" based on the prior art.

35 U.S.C. §§ 311, 312 (2000).

### 2.    Post-Grant Review Procedures Under the AIA

In the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125

Stat. 284 (2011), Congress substantially expanded the USPTO's procedures for

reconsidering its initial patentability decisions.  Among other things, the AIA

introduced an entirely new procedure:  "post-grant review."[4]  In the post-grant

review proceeding, any person other than the patent owner may petition to institute

a post-grant review, and the petitioner may participate in the proceedings and any

ensuing appeal.  35 U.S.C. §§ 321, 329.  A petition for such review must be filed

within nine months after a patent is issued.  35 U.S.C. § 321(c).

Unlike its predecessor statutes, the AIA provides that a petitioner in a post-

grant review may raise challenges on "any ground" that could be raised under 35

---

[4] The AIA also replaced inter partes reexamination with inter partes review, an
adversarial proceeding before the new Patent Trial and Appeal Board.  *See* 35
U.S.C. § 311.

4

U.S.C. § 282(b)(2) or (3). 35 U.S.C. § 321. Section 282(b) sets forth defenses to patent infringement. 35 U.S.C. § 282(b). Section 282(b)(2) refers to "[i]nvalidity of the patent or any claim in suit on any ground specified in part II [of the Patent Act] as a condition for patentability," and section 282(b)(3) refers to failure to comply with sections 112 (except best mode) and 251. 35 U.S.C. § 282(b)(2), (3). In turn, Part II of the Patent Act includes 35 U.S.C. §§ 101, 102, and 103, all of which relate to the patentability of inventions. 35 U.S.C. § 100, et seq.

The final House Judiciary Committee report explains this change. H. Rep. No. 112-98; *see* Joe Matal, A Guide to the Legislative History of the America Invents Act: Part II of II, 21 Fed. Cir. B.J. 539, 599 (2012). According to the report, the initial 1980 reexamination statute had "several limitations that later proved to make it a less viable alternative to litigation for evaluating patent validity than Congress intended." H. Rep. No. 112-98, at 45. These limitations included that "the requestor could not raise any challenge based on § 101 (utility, eligibility)." *Id.* Congress had responded to some of the criticisms by adding the inter partes reexamination procedure in 1999, but these reexaminations had similar limitations, and very few requests were filed. *Id.* at 46; *see also* 35 U.S.C. § 311(a) (2000). Accordingly, "[u]nlike reexamination proceedings, which provide only a limited basis on which to consider whether a patent should have issued," under the

AIA, "the post-grant review proceeding permits a challenge on any ground related to invalidity under section 282." H. Rep. No. 112-98, at 47-48.

### 3.    Covered Business Method Review Procedures Under the AIA

In an uncodified portion of the AIA, Congress also created a special "transitional post-grant review proceeding for review of the validity of covered business method patents." AIA § 18. Although this CBM review procedure is to "be regarded as, and shall employ the standards and procedures of, a post-grant review," AIA § 18(a)(1), it authorizes the Director to institute a post-grant review of any "covered business method patent" at any time during the term of the patent—*i.e.*, without regard to the normal nine-month window for post-grant review proceedings. *See* AIA § 18(a)(1)(A), (B), (E), 18(d).

Only a person who has "been sued for infringement of the patent or has been charged with infringement under that patent," however, may petition the Director to institute such a CBM review proceeding. AIA § 18(a)(1)(B). The AIA provides that the transitional post-grant review program for covered business method patents is available until September 15, 2020. *See* AIA § 18(a)(3)(A); 37 C.F.R. § 42.300(d). Only the Board's final written decision as to patentability in a post-grant review proceeding is subject to judicial review in this Court. *See* 35 U.S.C. §§ 328(a), 329. Congress provided that the Board's threshold decision whether to institute a post-grant review shall be "final and nonappealable." *See* 35 U.S.C. §

6

324(e); *see also In re Cuozzo Speed Techs., LLC*, –F.3d–, 2015 WL 448667 (Fed. Cir. 2015).

The final House Judiciary Committee report described the need for this procedure, observing that "[a] number of patent observers believe the issuance of poor [quality] business-method patents during the late 1990's through the early 2000's led to the patent 'troll' lawsuits that compelled the Committee to launch the patent reform project 6 years ago."  H. Rep. No. 112-98, at 54; *see also id*. at 80-81.  Similarly, the Senate Republican Policy Committee explained that the purpose of the CBM procedure was to permit the USPTO to reconsider business method patents whose validity under Section 101 was cast into doubt by *Bilski v. Kappos*, 561 U.S. 593 (2010) ("*Bilski*"):

> In its 1998 *State Street* decision, the Federal Circuit greatly broadened the patenting of business methods.  Recent court decisions, culminating in last year's Supreme Court decision in *Bilski v. Kappos*, have sharply pulled back on the patenting of business methods, emphasizing that these "inventions" are too abstract to be patentable. In the intervening years, however, PTO was forced to issue a large number of business-method patents, many or possibly all of which are no longer valid.  The Schumer proceeding offers a relatively cheap alternative to civil litigation for challenging these patents, and will reduce the burden on the courts of dealing with the backwash of invalid business-method patents.

157 Cong. Rec. S1367 (Mar. 8, 2011) (statement of Sen. Kyl); *see also* Matal, 21 Fed. Cir. B.J. at 628-29.

7

The Senate sponsors of the CBM review provisions provided similar explanations.  Senator Kyl stated that "section 101 invention issues" were among those "that can be raised in post-grant review."  157 Cong. Rec. S1375 (daily ed. Mar. 8, 2011); *see also* Matal, 21 Fed. Cir. B.J. at 628-29.  Similarly, Senator Schumer observed that the Supreme Court's section 101 decision in *Bilski v. Kappos* "made clear that abstract business methods are not patentable" but left "in limbo the many patents that were issued by the PTO since *State Street* that are not in fact valid."  157 Cong. Rec. S1363 (daily ed. Mar. 8, 2011).  He explained that "[t]he transition program created by the Schumer-Kyl amendment is designed to provide a cheaper, faster alternative to district court litigation over the validity of business-method patents."  *Id.*

### B.    Factual Background

#### 1.    The '582 Patent:  Systems and Methods for Providing Recipients of Future Retirement Benefits With the Present Value of Their Benefits

The '582 patent claims systems and methods to pay recipients of Social Security or other retirement benefits the present value of a portion of their expected future benefits.  A25, Abs.; A30, col. 1, ll. 1-15, 52-59.  The recipient does not assign or grant a security interest in the future retirement payments to the entity that funds the present payment.  A25, Abs.; A30, col. 2, ll. 10-29.  Instead, if the

benefits cease or the recipient exits the program, the funding source may recover assets other than the future retirement benefits from the recipient.  *Id.*

As the specification explains, various federal laws in the United States prohibit assigning or otherwise alienating future retirement benefits.  A30, col. 1, ll. 35-40 (citing the Social Security Act, the Employee Retirement Income Security Act of 1974, as amended (ERISA), and the United States tax laws).  Further, some retirees find their periodic retirement payments insufficient to meet their current financial needs.  A30, col. 1, ll. 21-30.  The claimed invention accordingly seeks to solve the problem of providing the present value of future retirement payments to beneficiaries "while complying with U.S. laws and regulations governing the assignment of future Social Security and other retirement benefits."  A30, col. 1, ll. 43-49; *see also id.* at col. 2, ll. 49-53.

In one embodiment of the invention, a beneficiary of retirement benefits elects to participate in the program for a specified term, and designates a financial institution to handle the deposits and transfers.  A32, ll. 34-38; A28, Fig. 2.  The financial institution sets up a direct deposit account to receive the beneficiary's benefits from their source, such as the U.S. Social Security Administration or a retirement plan.  A32, col. 5, ll. 38-41; A28, Fig. 2; A32, col. 5, ll. 8-17.  A bank, insurance company, or other source of capital is then designated to be the funding source for the current payment to the recipient, and the financial institution is

9

authorized to transfer funds from the recipient's deposit account to the funding source for the agreed term.  A32, col. 5, ll. 43-52; A28, Fig. 2.

The funding source then makes a payment to the beneficiary based at least in part on the present value of the designated part of the future benefits.  A32, col. 5, ll. 53-56; A28, Fig. 2.  When the retirement benefits are paid by the benefits source, they are then deposited into the deposit account, and a portion is automatically paid to the funding source.  A32, col. 5, ll. 60-65; A28, Fig. 2.  If the beneficiary revokes participation in the program, or if the retirement benefits are reduced or cut off by an action of the beneficiary, the beneficiary is obligated to repay the funding source from assets other than any new future retirement benefits. A32, col. 5, l. 66 – col. 6, l. 49; A28, Fig. 2.  The recipient, however, is entitled to and has not alienated these future retirement benefits.  A32, col. 6, ll. 12-19.

The '582 patent's specification further explains that "[d]esirably, and where appropriate, [the] system . . . utilizes existing computer capabilities, both hardware and software, and electronic communications links."  A32, col. 5, ll. 1-5; *see also* A30, col. 2, ll. 30-35 (the system uses "known computer capabilities and electronic communications links").  The system accordingly may be set up "without a significant investment in system architecture design and software development." A32, col. 5, ll. 5-8.  The specification makes clear that "the techniques for determining present value are well known to those of ordinary skill in the art."

10

A32, col. 5, ll. 56-59; *see also* col. 3, ll. 41-46; col. 7, ll. 15-18.  The technique of

"electronic funds transfer" is also described as "well-known."  A32, col. 5, ll. 19-

21.

     Claim 1 is illustrative:

     1.  A computerized method for creating a source of funds based on present value of future retirement payments, comprising the steps of:

    a.  designating an account in a depository for a beneficiary to receive future retirement payments payable to said beneficiary from a source of said retirement payments for a preselected period of time;

    b.  designating a benefit provider for providing a monetary benefit to said beneficiary;

    c.  authorizing said depository to periodically disburse a predetermined portion of said retirement payments deposited in said account to said benefit provider during said preselected period of time;

    d.  providing said monetary benefit to said beneficiary from said benefit provider based at least in part on present value of a designated portion of said future retirement payments without encumbering said beneficiary's right to said future retirement payments and without violating legislated proscriptions in the United States against alienation of future retirement benefits;

    e.  causing said future retirement payments to be deposited into said account throughout said preselected period of time;

    f.  causing said depository to transfer a portion of said retirement payments deposited into said account to said benefit provider during said preselected period of time; and

    g.  reimbursing said benefit provider from resources other than said future retirement payments if said transfer of a portion of said retirement payments from said depository to said benefit provider are curtailed prior to said end

of said preselected period of time, and making said retirement payments
available for the exclusive use of said beneficiary.

A33-34 (col. 8, l. 57 – col. 9, l. 24).  The other method claim, claim 18, limits the

future retirement benefits to Social Security benefits.  A35.

Claims 13-14 and 30-31 are system claims drafted in means-plus-function

format.  A35-36.  Claims 13 and 30 are otherwise similar to claim 1, and claim 30

limits the retirement benefits to Social Security benefits.  Dependent claims 14 and

31 simply require the benefit provider to be a source of capital.  *Id.*

### 2.    The Board Decision

After conducting the CBM review and following an oral hearing, the Board

concluded that the challenged claims of the '582 patent are unpatentable under 35

U.S.C. § 101.  A21.  As an initial matter, the Board construed the claims.  A6-8.

The Board rejected Retirement Capital's argument that method claims 1 and 18

require the retirement benefits to be directly "deposited" via electronic funds

transfer, but accepted its argument that the means-plus-function system claims 13

and 30 include this requirement.  A6-A8.

Next, the Board rejected Retirement Capital's argument that CBM review

proceedings cannot evaluate patentability under section 101.  A9-10.  The Board

explained that both the Supreme Court and this Court have found that section 101

is a "condition for patentability," as provided in 35 U.S.C. § 282(b)(2).  A9.  The

Board further observed that the legislative history of the AIA makes clear that

Congress intended the CBM program to evaluate business-method patents under section 101 in light of the Supreme Court's decision in *Bilski v. Kappos*. A10.

The Board then proceeded to apply the Supreme Court's two-part framework, most recently articulated in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), to analyze the claims under section 101. A10-20. The Board explained that the challenged claims involve the abstract idea of advancing funds based on future retirement payments,[5] which has long been a prevalent economic practice. A13. The Board accordingly searched the claim language for limitations "sufficient to ensure that the patent in practice amounts to significantly more than a patent on the [abstract idea] itself," *id.* (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012)), but found none. A13-20. The limitations requiring the present value payment to be provided "without encumbering" or "without alienating" the future retirement benefits simply require the transaction to be legal, according to the Board, which is a routine and conventional practice in business transactions. A13-14. Further, these limitations are phrased at a high level of generality that does not meaningfully limit the claims. *Id.*

The Board also rejected the argument that the use of a computer was sufficient to meaningfully limit the claims. The Board found that method claims 1

---

[5] Retirement Capital was "happy to accept" this formulation of the abstract concept at the Board's oral hearing. A13 (quoting A337).

and 18 do not require the use of a computer, and could instead be performed by oral transaction with a physical exchange of money or via pen and paper. A14-16. Even if the claims were construed to require a computer, the Board found that the claimed invention "requires only routine computer hardware and programming" to simply perform more efficiently what could otherwise be accomplished manually. A16-17. With respect to system claims 13 and 20, the Board engaged in substantially the same analysis, rejecting the argument that the system claims here receive a substantively different analysis under section 101 than do the method claims. A18. The Board found that requiring the benefit provider to be a source of capital, as in dependent claims 14 and 31, also does not meaningfully limit the claims. A18.

The Board concluded that expert testimony was not required for it to determine whether these limitations offered "significantly more" than an abstract idea. A19. The technology was not complicated, and the specification itself stated that it relied on "existing" and "well-known" technology. A19. The Board decided it also did not need evidence to evaluate the "without encumbering" limitations because they are non-technological and easily understood. A19.

Finally, the Board rejected the argument that a defendant's non-infringement contentions mean that a claim is not patent-ineligible because it does not preempt an abstract idea. A20. The Board found that defendants are permitted to plead in

14

the alternative, and that preemption is not the only aspect of the section 101

analysis because a claim also is not patent-eligible "where it merely recites an

abstract idea and adds additional steps that merely reflect routine, conventional

activity of those of ordinary skill in the art." A20.

## III.    SUMMARY OF THE ARGUMENT

After instituting a CBM review of certain claims in Retirement Capital's

'582 patent, the Board determined that the challenged claims are directed to

nothing more than an abstract idea implemented with pen and paper or routine

computer hardware and programming.  The agency therefore concluded the claims

should be cancelled.  That determination was correct and amply supported by the

record, and Retirement Capital identifies no proper basis on which it may be set

aside.

Retirement Capital's claim that the AIA forbids challenges under 35 U.S.C.

§ 101 in a post-grant review procedure for covered business method patents is

inconsistent with the statutory text and longstanding precedent.  The context and

purpose of the statute show that Congress intended section 101 to be one of the

grounds for CBM review, and the legislative history of the AIA confirms this

intent.  Retirement Capital's arguments to the contrary ignore the holdings of

*Alice*, *Mayo*, and *Bilski*.  Indeed, if Retirement Capital's interpretation of the

statute were correct, section 101 would not be an invalidity defense in patent

infringement cases in the federal courts.  The Board correctly rejected this argument.

The Board also correctly concluded that the challenged claims are patent-ineligible under the abstract-idea exception to section 101.  The claims are directed to methods and systems to pay retirees the present value of their retirement benefits.  The Board correctly determined that this concept was an abstract idea, and that the claims do not do significantly more than add routine, conventional activity to that idea.  Further, whether or not some or all of the claims are construed to require use of computerized electronic funds transfer systems, any computer limitation is entirely conventional and cannot render the otherwise abstract claims patentable.[6]

Finally, as the Board found, the Supreme Court in *Alice* has already rejected Retirement Capital's argument that claims to machines, as opposed to processes, automatically are not abstract under section 101, even if they incorporate only generic computer limitations.  Retirement Capital's contention that the Board needed to rely on specific expert or factual evidence to find the claims at issue ineligible under section 101 is also inconsistent with this Court's precedent.  And

---

[6]  The Board's construction of the term "deposited" as not limited to direct deposit via electronic funds transfer is not material to the ultimate disposition of this proceeding because the Board concluded that even if the term required a computer, the claims are unpatentable.  A17; *see infra,* pp. 35-38.  The Director, as intervenor, therefore does not address Retirement Capital's argument that the Board erred in its construction.

Retirement Capital's argument that a defendant's non-infringement contentions

prove that the challenged claims do not preempt an abstract idea fundamentally

misunderstands the Supreme Court's *Alice* decision, and has been rejected by this

Court as well.

## IV.    ARGUMENT

### A.    Standard of Review

Whether a claim is drawn to patent-eligible subject matter under section 101

is an issue of law that this Court reviews *de novo*. *In re Ferguson*, 558 F.3d 1359,

1363 (Fed. Cir. 2009). Regulations issued by the USPTO under a statutory grant

of rulemaking authority are entitled to deference unless based on an unreasonable

construction of the statute, *see Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council,

Inc.*, 467 U.S. 837 (1984), and the USPTO's interpretation of its own regulations is

"controlling unless plainly erroneous or inconsistent with the regulation," *Auer* v.

*Robbins*, 519 U.S. 452, 461 (1997) (internal quotation marks omitted). The

Board's actions may not be set aside unless "arbitrary, capricious, an abuse of

discretion, unsupported by substantial evidence, or otherwise not in accordance

with law." *In re Sullivan*, 362 F.3d 1324, 1326 (Fed. Cir. 2004); 5 U.S.C.

§ 706(2)(A).

### B.     The Board May Consider Subject-Matter Eligibility Under Section 101 in a CBM Review

#### 1.     Judicial Precedent and the Language and Context of the Patent Act Provide That Section 101 Is a Ground for CBM Review

The language and context of the Patent Act show that Congress intended section 101 to be a basis for CBM review.  It is well-settled that patent-eligibility issues under 35 U.S.C. § 101 are "conditions for patentability," which the AIA authorizes as grounds for CBM review.  The Board correctly found that decisions from this Court and the Supreme Court interpreting the Patent Act foreclose Retirement Capital's argument to the contrary.[7]  A9-10.

In the AIA, Congress provided that a petition for post-grant review may assert, as a basis for unpatentability, "any ground that could be raised under paragraph (2) or (3) of section 282(b) (relating to invalidity of the patent or any

---

[7] Retirement Capital's brief does not challenge the Board's decision to institute the proceeding at issue here, but rather its "final" decision to "maintain" the CBM proceeding.  *See, e.g.,* Br. 1-2; 7-9; 34; 43 (offering no specific arguments as to the decision to institute or its reviewability).  To the extent that Retirement Capital may offer this argument in reply, it is waived.  *See SSL Servs., LLC v. Citrix Sys., Inc.*, 769 F.3d 1073, 1085 (Fed. Cir. 2014) (holding that this Court's "law is well established that arguments not raised in the opening brief are waived") (quoting *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319) (Fed. Cir. 2006).  Even if this argument is not waived, the Board's initial decision to institute the CBM review is "final and nonappealable" and not reviewable, as this court recently held in interpreting identical statutory language concerning *inter partes* review.  35 U.S.C. § 324(e); 35 U.S.C. § 314(d); *In re Cuozzo Speed Techs., LLC*, –F.3d–, 2015 WL 448667 (Fed. Cir. 2015).  The Director does not dispute that jurisdiction exists for this Court to review the Board's *final* decision.

18

claim)." 35 U.S.C. § 321(b).  Section 282(b)(2), in turn, provides that a patent may

be held invalid in litigation on "any ground specified in part II as a condition for

patentability."  35 U.S.C. § 282(b)(2).[8]

Section 101 is one such "condition for patentability."  Section 101, along

with sections 102 and 103, are grouped together in II of the Patent Act, chapter 10,

all relating to patentability.  35 U.S.C. § 100 et seq.  As the Supreme Court

explained almost half a century ago, the Patent Act "sets out the conditions of

patentability in three sections":  101, 102, and 103.  *Graham v. John Deere Co.*,

383 U.S. 1, 12 (1966).  This Court likewise has recognized as "beyond question"

that section 101 as well as sections 102 and 103 are conditions for patentability

that qualify as defenses under section 282(b)(2).  *Aristocrat Techs. Australia PTY

Ltd. v. Int'l Game Tech.*, 543 F.3d 657, 661 n.3 (Fed. Cir. 2008); *see also

Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1330 n.3 (Fed. Cir. 2012) (rejecting the

dissent's suggestion that section 101 does not impose a "condition of patentability"

because its title does not include that phrase, and holding claims invalid under

section 101).

On its face, section 101 contains "conditions" for patentability under the

plain meaning of the term.  *See Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*,

132 S. Ct. 1670, 1680 (2012) (explaining that interpretation of a statute starts

---

[8]  Section 282(b)(3) refers to failure to comply with sections 112 (except best mode) and 251.  35 U.S.C. § 282(b)(2), (3).

"where all such inquiries must begin:  with the language of the statute itself")
(citations omitted).  This Court has described "conditions" for patentability as
"fundamental preconditions," or criteria that patentability is "dependent upon."
*Aristocrat*, 543 F.3d at 661 (citing *Graham*, 383 U.S. at 12).  Similarly, the
Merriam-Webster Dictionary defines a "condition" as "something essential to the
appearance or occurrence of something else:  prerequisite."[9]  Section 101 sets out
criteria that an invention must meet to be patentable:  the invention must be a "new
and useful process, machine, manufacture, or composition of matter, or any new
and useful improvement thereof . . . .".  35 U.S.C. § 101.  Meeting these
requirements is a fundamental precondition or prerequisite for an invention to be
patentable, and patentability is "dependent upon" satisfying them.  *Aristocrat*, 543
F.3d at 661 n.3; *see also, e.g., Alice*, 134 S. Ct. at 2354 (explaining that laws of
nature, natural phenomena, and abstract ideas that do not meet these criteria are not
patentable).

The text of section 321(b), which directly governs the grounds available in
post-grant review proceedings, also supports this conclusion.  Section 321(b) refers
broadly to "*any ground* that could be raised" under section 282(b), indicating an
inclusive reading of the provision.  35 U.S.C. § 321(b) (emphasis added).  Section
321(b) further describes section 282(b) as "relating to invalidity of the patent or

_____

[9] Merriam-Webster Dictionary (2015) (online), *available at* http://www.merriam-
webster.com/dictionary/condition.

any claim," which suggests that its drafters cited to section 282(b) as a way of incorporating the patent invalidity defenses.  *Id.*

The broader context and purpose of the Patent Act confirms this interpretation.  *See, e.g.*, *Caraco Pharm. Labs., Ltd.*, 132 S. Ct. at 1680 (interpreting a provision of the Hatch-Waxman Act in "the context of the entire statute") (citation omitted)[10]; *American Broadcasting Cos., Inc. v. Aereo, Inc.*, 134 S. Ct. 2498, 2511 (2014) (explaining that "courts often apply a statute's highly general language in light of the statute's basic purposes.").

If section 101 were not a condition of patentability under section 282(b), patent eligibility would not provide an invalidity defense in infringement litigation. Yet, as the Board observed, this Court and the Supreme Court have often reviewed invalidity challenges under section 101 in infringement cases.  A9; *see, e.g., Alice Corp. Pty, Ltd*, 134 S. Ct. 2347 (2014); *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012); *Content Extraction and Transmission v. Wells Fargo Bank, Nat'l Assn.*, 776 F.3d 1343 (Fed. Cir. 2014); *Ultramercial, Inc. v. Hulu*, 772 F.3d 709 (Fed. Cir. 2014).

---

[10] *See also United Savings Ass'n v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365, 371 (1988) (citations omitted) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme — because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.").

Further, when Congress in the AIA wanted to refer only to invalidity challenges under sections 102 or 103, it did so by referring to those sections explicitly. *See, e.g.*, *Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006) ("A familiar statutory principle . . . is that a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute.").  For example, Congress in the AIA addressed the extent to which CBM review proceedings, "on a ground raised under sections 102 or 103 of title 35," may rely on pre- or post-AIA definitions of prior art. *See* AIA § 18(a)(1)(C).  Congress logically did not include section 101 in this provision because, unlike sections 102 and 103, a section 101 defense is not directly tied to the definition of prior art. *Id.*; *see also, e.g.*, AIA, § 14(a) (requiring that "[f]or purposes of evaluating an invention under section 102 or 103 of title 35, United States Code," any strategy for reducing tax liability shall be insufficient to differentiate a claimed invention from the prior art).  Similarly, as it had with *inter partes* reexaminations, Congress limited *inter partes* reviews in the AIA only to "ground[s] that could be raised under section 102 or 103."  AIA, § 6(b).  If Congress had wanted CBM review proceedings only to be limited to sections 102 or 103 (as well as 112 and 251), it would have referred to those sections directly.

It also would be highly anomalous for Congress to authorize post-grant review and CBM review proceedings under sections 102, 103, 112 (except best

mode), and 251 – but not section 101.  Essentially every other means of proving a

patent invalid or unpatentable except section 101 would be covered.  There is

nothing in the AIA that suggests a rationale for this interpretation or that suggests

that the statute is intended to function in this way.  Retirement Capital offers none.

To the contrary, section 18 of the AIA, which added the provisions

authorizing CBM proceeding, includes a "rule of construction" that this section

should not be interpreted "as amending or interpreting categories of patent-eligible

subject matter set forth under section 101 of title 35."  AIA, § 18(e).  There would

be no need for section 18 to include this provision if section 101 could not be

addressed in CBM review proceedings.  *See Hibbs v. Winn*, 542 U.S. 88, 101

(2004) ("[A] statute should be construed so that effect is given to all its provisions,

so that no part will be inoperative or superfluous, void or insignificant . . . .")

(citations omitted).

## 2.    The Legislative History of the AIA Confirms That Congress Intended Section 101 as a Ground for CBM Review

The Board correctly found that the legislative history of the AIA confirms

that Congress intended to allow section 101 challenges in CBM review and post-

grant review proceedings.  A10; *see Toibb v. Radloff*, 501 U.S. 157, 162 (1991)

("[A] court appropriately may refer to a statute's legislative history to resolve

statutory ambiguity . . . .").  The AIA's legislative history is replete with statements

that Congress intended to considerably expand the Board's existing procedures for

reconsidering the validity of patents, which previously had been limited to reviews based on patents and printed publications under sections 102 and 103. The new CBM review proceedings in particular were intended to allow challenges to business method patents of doubtful validity under section 101 after the Supreme Court's *Bilski* decision. Retirement Capital does not identify any contrary statements, or even attempt to challenge the thrust of the legislative record. Br. 17-18.

The final House Judiciary Committee report provides perhaps the most definitive statements that Congress intended section 101 to be a basis for post-grant reviews. H. Rep. No. 112-98; Matal, 21 Fed. Cir. B.J. at 599. The report critiqued the existing reexamination procedures because "the requestor could not raise any challenge based on § 101 (utility, eligibility)." H. Rep. No. 112-98, at 45-48. The report then contrasted these "limited" reexamination proceedings with post-grant review, which "permits a challenge on any ground related to invalidity under section 282." *Id.* Congress accordingly indicated its intent to remedy the lack of section 101 challenges in reexamination by allowing them in the new post-grant review proceedings. *Id.*; *see, e.g., Zuber v. Allen*, 396 U.S. 168, 186 (1969) ("A committee report represents the considered and collective understanding of those Congressmen involved in drafting and studying the proposed legislation.").

The House report amplified this message with respect to CBM review—justifying the need for the CBM review procedure based on a rise in "poor [quality] business-method patents during the late 1990's . . . ."  H. Rep. No. 112-98, at 54 (responding to the issuance of the Federal Circuit's decision addressing section 101 in *State Street Bank and Trust Co. v. Signature Fin'l Group, Inc.*, 149 F.3d 1368 (Fed. Cir. 1998)); *see also* H. Rep. No. 112-98 at 80-81.  As the Senate Republican Policy Committee further explained, CBM proceedings were designed to allow challenges to business method patents that issued after the *State Street* decision, but which would be found unduly "abstract" under the Supreme Court's reasoning in *Bilski* interpreting section 101.  *See* 157 Cong. Rec. S1367 (Mar. 8, 2011) (statement of Sen. Kyl).

The two co-sponsors of the CBM provision, Senators Schumer and Kyl, also confirmed that CBM review proceedings would allow the Board to reconsider business-method patents under section 101 in light of *Bilski*. 157 Cong. Rec. S1375 (daily ed. Mar. 8, 2011) (Kyl) (stating that "section 101 invention issues" were among those "that can be raised in post-grant review"); 157 Cong. Rec. S1363 (daily ed. Mar. 8, 2011) (Schumer) (stating that *Bilski v. Kappos* "made clear that abstract business methods are not patentable" and that the CBM review procedure is designed as an alternative to district court litigation "over the validity of business-method patents."); *see also* Matal, 21 Fed. Cir. B.J. at 628-29.  While

floor statements in legislative histories are typically not given as much weight as committee reports, floor statements by the sponsors are given considerably more weight than floor statements by other members.  *See, e.g., Kenna v. U.S. Dist. Court for the C.D. Cal.*, 435 F.3d 1011, 1015 (9th Cir. 2006).  Here, the co-sponsors' statements accord with both the final Committee report and the text of the statute that Congress intended section 101 to be available as a ground for CBM reviews.

### 3.    Retirement Capital's Arguments Lack Merit

Retirement Capital's challenges to the Board's conclusions are unpersuasive. A11-18.  Its arguments give undue weight to statutory headings, and undervalue the statute's plain language, context, and legislative history.  Retirement Capital relies on language in cases that, in context, does not bear on the issues at hand, and ignores the substance of the Supreme Court's holdings in *Bilski*, *Mayo*, and *Alice*. Finally, its criticisms of *Graham* and *Aristocrat* are not on point, and ignore this Court's precedent in *Dealertrack*.

As an initial matter, this Court has already rejected Retirement Capital's argument that the titles of sections 102 and 103 indicate that Congress intended in section 282(b)(2) to permit validity challenges only under these sections.  Br. 11. In *Dealertrack, Inc. v. Huber*, this Court rejected the dissent's suggestion that section 101 does not impose a "condition of patentability" because its title does not

26

include that phrase.  674 F.3d 1315, 1330 n.3 (Fed. Cir. 2012).  Instead, the Court relied on the Supreme Court's pronouncement in *Pennsylvania Department of Corrections v. Yeskey*, that a statute's title "cannot limit the plain meaning of the text." 524 U.S. 206, 212 (1998) (quoting *Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-529 (1947)).  This Court concluded that the criteria of section 101 supply "conditions for patentability" and are within the ambit of patent defenses under section 282.  *Dealertrack*, 674 F.3d at 1330-31.  The heading of section 101, "Inventions Patentable," also connotes that section 101 demarks conditions of what may or may not be patented, and is wholly consistent with the substance of the section.[11]

Retirement Capital next argues that, by permissively listing patentable subject matter "subject to the conditions and requirements of this title," the language of section 101 shows that its requirements are not conditions of patentability.  Br. 12.  But this argument is flawed because the language of section 101 itself imposes conditions of patentability *in addition* to the other conditions and requirements imposed by the remainder of the title.  35 U.S.C. § 101.  *Dealertrack*, 674 F.3d at 1330 n.3; *see also Mayo Collaborative Services*, 132

---

[11] Nor does the use of the term "specified in" in section 282(b)(2) indicate that Congress meant that the headings of sections in part II of the Patent Act control, as Retirement Capital contends.  Br. 11.  The phrase "specified in" is a common way for one statutory provision to refer to the contents of another; a Westlaw search of the U.S. Code reveals 5294 examples of such usage.

S.Ct. at 1303-04 (indicating that the legislative history of the 1952 Patent Act shows that the "conditions" include those within section 101 itself).  In any event, the language of section 101 is not sufficiently clear as to preclude an examination of the structure and function of the statutory scheme and its legislative history, as Retirement Capital suggests.  Br. 12, 17.  These sources of interpretation instead confirm that section 101 is a "condition for patentability" that may be used to prove patent claims invalid—in district court and in post-grant review and CBM review proceedings, as discussed in Section III.B.1-2, *supra*.

Retirement Capital also incorrectly faults the Board for relying on *Graham* and *Aristocrat* to interpret section 101.  Br. 13; *Graham*, 383 U.S. 1; *Aristocrat Techs. Austl. PTY Ltd.*, 543 F.3d 657.  Retirement Capital is right that *Graham's* primary holding is that section 103 of the 1952 Patent Act was intended to codify judicial precedent on obviousness.  *Graham*, 383 U.S. at 3-4.  To reach that holding, however, the Supreme Court engaged in a searching historical review of "conditions for patentability" and how these conditions arose.  *Id.* at 5-13.  Accordingly, when the Court explained that section 101 was included in the 1952 Act as a condition of patentability, it did not do so lightly.  *Id.* at 12.  It is also unimportant that in doing so the *Graham* Court only explicitly mentioned the utility requirement of section 101.  *Aristocrat*, 543 F.3d at 661 n.3.  As this Court recognized in *Aristocrat*, referencing section 101 in that manner was a common

28

shorthand, and does not suggest that patentable subject matter is not also a

condition for patentability. *Id.* It would be nonsensical for only one of the section

101 requirements to be a condition for patentability while the others are not.

Retirement Capital faults the Board's reliance on *Aristocrat* for similar

reasons as it did *Graham.* Br. 14. But this Court in *Aristocrat* also engaged in an

in-depth analysis of the conditions for patentability in order to conclude that

"improper revival" was not one of the defenses to infringement under section 282.

*Aristocrat*, 543 F.3d at 661-62. Moreover, Retirement Capital fails to mention the

*Dealertrack* decision, in which this Court rejected the arguments Retirement

Capital makes, and further held the claims at issue invalid based on the section 282

defense of lack of patentable subject matter under section 101. 674 F.3d at 1330-

34.

Retirement Capital points to language in *Diamond v. Diehr*, 450 U.S. 175

(1981), and *Bilski.* Br. 14-16. Yet the text Retirement Capital relies on in *Diehr*

simply rejects the concept that that section 101 incorporates novelty, unlike

sections 102 and 103. 450 U.S. at 189-91. The point of the text in *Diehr* is that

sections 101 and 102 are two separate considerations, and that novelty has no role

in section 101. *Id.* Similarly, the language Retirement Capital relies on in *Bilski* is

intended to emphasize that while an invention must first satisfy section 101, it also

must satisfy sections 102 and 103. *Bilski*, 561 U.S. at 602. *Bilksi* does not exclude

section 101 from providing conditions for patentability, and does not attempt to override the Court's prior contrary explanation in *Graham*. *Id.*

More to the point, *Bilski* made clear that the Supreme Court viewed patentable subject matter under section 101 as an important requirement (or "condition") for patentability and validity, not as a fairly passive backstop of last resort. *Id.* at 609-12 (explaining that the claims at issue are unpatentable because they "attempt to patent the use of the abstract idea of hedging risk in the energy market and then instruct the use of well-known random analysis techniques").

The Supreme Court made that view even more evident in *Mayo*, when it gave a strong indication that it understood the "conditions of patentability" to include section 101. *Mayo Collaborative Services*, 132 S.Ct. at 1303-04. In *Mayo*, the Supreme Court rejected the government's argument that courts should first reach sections 102, 103, and 112 to screen out many inventions otherwise unpatentable under section 101, finding that doing so would make section 101 a "dead letter." 132 S. Ct. at 1303-04. The Court then cited to H.R. Rep. No.1923, 82d Cong., 2d Sess., 6 (1952), which states, "A person may have 'invented' a machine or a manufacture, which may include anything under the sun that is made by man, *but it is not necessarily patentable under section 101* unless the conditions of the title are fulfilled." *Id.* (emphasis added by the Court). The *Mayo* Court accordingly viewed the legislative history of the original 1952 Patent Act as

30

showing that the "conditions" of the Patent Act included those within section 101 itself. *Id.*

Finally, Retirement Capital cites this Court's decision in *Myspace, Inc. v. GraphOn Corp.*, 672 F.3d 1250 (Fed. Cir. 2012). Br. 16. But *Myspace* does not hold that section 101 cannot be raised as a defense under section 282. 672 F.3d at 1261 ("Does this mean that § 101 can never be raised initially in a patent infringement suit? No."). Moreover, such a holding could not be squared either with the earlier decision in *Dealertrack,* or with the Supreme Court's decision in *Graham*, or, more recently, *Mayo* and *Alice.* To the extent that *Myspace* (or *dicta* in other Federal Circuit cases) suggests that patentable subject matter under section 101 is not a defense under section 282, that suggestion is inconsistent with controlling precedent. *Id.* In any event, *Myspace* merely indicates that courts should "avoid reaching for" section 101 when more narrow provisions like sections 102, 103, and 112 can decide the case. *Id.* at 1260-61.

## C. The Board Correctly Concluded that the Challenged '582 Patent Claims Are Unpatentable Under the Abstract Idea Exception to Section 101

### 1. Retirement Capital's Claims Do Not Satisfy the *Alice* Test

The Board correctly found that Retirement Capital's claims are directed to abstract ideas and lack something more that would render them eligible under

section 101.  Retirement Capital identifies no proper basis for disturbing the

Board's determination, which was amply supported by the record before it.

Section 101 of the Patent Act defines four categories of patent-eligible

subject matter:  processes, machines, manufactures, and compositions of matter.

35 U.S.C. § 101; *see also* 35 U.S.C. § 100(b).  From those broad categories, the

Supreme Court has carved out three exceptions of subject matter ineligible for

patent protection:  "[l]aws of nature, physical phenomena, and abstract ideas. . . ."

*Alice*, 134 S. Ct at 2354 (citation omitted); *Mayo*, 132 S. Ct. at 1293.

In *Alice*, the Supreme Court applied a two-step "framework" to determine

whether a patent claims abstract ideas or other patent-ineligible concepts under 35

U.S.C § 101.  134 S. Ct. at 2355.  First, the Board must "determine whether the

claims at issue are directed to one of those patent-ineligible concepts."  *Id.*  If it

finds that they are, the Board must then consider "the elements of each claim both

individually and as an ordered combination to determine whether the additional

elements transform the nature of the claim into a patent-eligible application."  *Id.*

(internal quotations omitted).  A claim must incorporate enough meaningful

limitations to ensure that the patent in practice amounts to "significantly more"

than the abstract idea itself, and not merely a "drafting effort designed to

monopolize the [abstract idea]" itself.  *Id.* at 2355, 2357.  "[W]holly generic

computer implementation" or other "routine" and "conventional" activities are not sufficient to impart patentability. *Id.* at 2358-59.

For example, in *Alice*, the Court held that computer-implemented methods and systems for mitigating settlement risk using an intermediary were ineligible for patent protection under 35 U.S.C § 101. *Alice*, 134 S. Ct. at 2357, 2360. The Court concluded that these claims merely seek to cover "fundamental economic practice[s]" and other "method[s] of organizing human activity," *id.* at 2356, – and were thus "squarely within the realm of 'abstract ideas' as we have used that term." *Id.* at 2357; *see also, e.g., Bilski*, 130 S. Ct. at 3223-3234, 3231 (concluding that the claimed method of hedging weather-related risk in energy markets is an unpatentable abstract idea).

Here, the Board correctly applied the *Alice* framework to find the challenged '582 patent claims patent-ineligible under section 101. A12-13. The claims at issue involve advancing funds based on the present value of future retirement benefits. *Id.*; A33-36. This is an abstract idea because it amounts to nothing more than a "method of organizing human activity" and a "fundamental economic practice" like the methods in *Bilski* and *Alice. Alice*, 134 S. Ct. at 2356 (discussing *Bilski*). Advancing payments based on the present value of future income streams is a basic principle of corporate and personal finance that simply manipulates the time value of money. It is at least as abstract as other economic methods that both

33

the Supreme Court and this Court have held invalid under section 101. *See Alice*, 134 S. Ct. at 2356 (concept of intermediated settlement, *i.e.*, the use of a third party to mitigate settlement risk); *Bilski*, 130 S. Ct. at 3223-3234, 3231 (method of hedging weather-related risk in energy markets); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) (creating a transaction performance guaranty for a commercial transaction); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315 (Fed. Cir. 2012) (method of processing credit applications for automobile purchases); *Fort Properties, Inc. v. American Master Lease LLC*, 671 F.3d 1317 (Fed. Cir. 2012) (method of organizing real estate investments to enable tax-free exchanges of property); *CyberSource Corp. v. Retail Decisions*, Inc., 654 F.3d 1366 (Fed. Cir. 2011) (method of detecting fraud in credit-card transactions).

Further, Retirement Capital's claims also differ substantially from those that this Court found in *DDR Holdings* to be "rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257-58 (Fed. Cir. 2014) (system for a host website to send visitors to a web page that incorporates "look and feel" elements from the host website but provides visitors with the opportunity to purchase products from a third-party merchant). Advancing the present value of funds based on future retirement income streams is a "business practice" that did not arise with the creation of the internet, computers, or

34

electronic funds transfer. *Id.* Indeed, Retirement Capital accepted the Board's formulation of the abstract idea at issue in the oral hearing below, instead arguing that the claim nevertheless meaningfully limited the idea. A13; A337-39.

Turning to the next step of the *Alice* framework, the Board correctly found that the limitations of the challenged claims were routine and conventional and did not substantially limit the claims beyond the abstract idea itself. A13-A18. The claims recite designating a depository account for the beneficiary's retirement payments to be paid into for a certain period of time, designating a benefits provider, and authorizing periodic payment of a portion of the benefits from the account to the benefits provider. *E.g.*, Cl. 1, A33-34. The benefits provider provides a monetary benefit to the beneficiary based, at least in part, on the present value of the designated portion of the benefits and without encumbering future benefits or violating U.S. laws against alienating the beneficiary's right to receive future benefits. *Id.* Then, when the expected benefits are paid to the depository account, the designated portion is transferred to the benefits provider. *Id.* If the retirement benefits are curtailed before the end of the preselected period of time, the benefits provider may be reimbursed by the retiree from resources other than the retirement benefits. *Id.*

Put more simply, other than advancing the present value of future retirement payments, the claims simply involve:  setting up bank accounts with automatic

35

transfers and deposits, making the automatic deposits and transfers, and doing so without violating U.S. laws. *Id.* These steps may be implemented through electronic funds transfer systems, pen and paper, or even oral instructions with physical cash transfers. A16. These are all indisputably routine and conventional aspects of banking and finance, and amount to offering unsecured credit (similar to a "payday" loan). These features are also similar to those at issue in *Alice*, which included: (1) "electronic recordkeeping"; (2) "obtain data"; (3) "adjust account balances"; and (4) "issue automated instructions." *Alice*, 134 S. Ct. at 2359; *see also, e.g., Content Extraction*, 776 F.3d at 1347 (concluding that reviewing checks, recognizing relevant data, and storing that information in their records were well-known bank functions).

Just as in *Alice*, to the extent the challenged claims include computers or electronic funds transfer, they are limited to "purely conventional" or "generic" functions. A17-18. *Alice*, 134 S. Ct. at 2359; *see also, e.g.*, *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada*, 687 F.3d 1266 at 1278-79 (Fed. Cir. 2012); *Dealertrack*, 674 F.3d at 1333. The claims do not purport to improve the functioning of the computer itself, and do not effect any improvement in any other technology or technical field. *Alice*, 134 S. Ct. at 2359.

Even if there were any doubt as to the generic and conventional nature of these limitations, as the Board found, the written description of the '582 patent

removes it.  A16-19.  The specification explains that the technique of "electronic funds transfer" is "well-known."  A32, col. 5, ll. 19-21.  If computers are used in the system, they preferably are "existing computer capabilities, both hardware and software, and electronic communications links . . . ."  A32, col. 5, ll. 1-5; *see also* A30, col. 2, ll. 30-35.  Further, the specification states that the techniques for "determining present value of a future income stream are well known to those of ordinary skill in the art."  A32, col. 5, ll. 56-59; *see also* A31, col. 3, ll. 41-46; A33, col. 7, ll. 15-18.  Similarly, the specification admits that various U.S. statutes "proscri[be] . . . assigning or otherwise alienating future retirement benefits."  A30, col. 1, ll. 34-35; *see also id.* at ll. 43-49.[12]  These routine and conventional limitations cannot impart patentability to an otherwise abstract idea.[13]

### 2.   Drafting Claims to a Machine, Rather Than a Process, Does Not Automatically Insulate Them From Section 101

Retirement Capital seeks to avoid the conclusion that its claims are abstract by arguing that its system claims, at least, are patentable.  Br. 19-23.  Retirement

---

[12]  As the Board further found, the "without encumbering . . . future retirement payments" and "without violating legislative proscriptions in the United States" limitations are also phrased at a high level of generality, and for that reason also do not meaningfully limit the claim.  A13-14.

[13]  Similarly, the dependent claims limiting the benefit provider to being a "source of capital," or limiting the retirement benefits to Social Security benefits, also do not meaningfully limit the claims.  A18.  It is almost axiomatic that an institution that makes a payment will have capital, and Social Security benefits are a conventional form of retirement benefits.

Capital argues that because claims 13-14 and 30-31 are means-plus-function claims that recite adequate structure in the specification, they claim a machine, and are not abstract under section 101 because they satisfy the "machine or transformation" test.  Br. 19-23.  Retirement Capital observes that all but one of the Supreme Court's section 101 decisions since *Gottschalk v. Benson*, 409 U.S. 63 (1972), concerned whether processes, not machines, are patentable.  Br. 20.

But the Supreme Court rejected any such distinction in *Alice*, holding that the system claims reciting computer hardware at issue there were "no different from the method claims."  134 S. Ct. at 2360; *see also DDR Holdings*, 773 F.3d at 1255-56 ("While the Supreme Court in *Bilski v. Kappos* noted that the machine-or-transformation test is a 'useful and important clue' . . . after *Alice*, there can remain no doubt:  recitation of generic computer limitations does not make an otherwise ineligible claim patent-eligible.").  The Supreme Court explained that it had long "'warn[ed] . . . against' interpreting § 101 'in ways that make patent eligibility 'depend simply on the draftsman's art.'"  *Alice,* 134 S. Ct. at 2360 (citations omitted).  The Court explained that the system claims there recited "a handful of generic computer components configured to implement the same [abstract] idea" as the method claims, and thus "add nothing of substance" to the underlying abstract idea.  *Id.*

Here, as the Board found, the structural limitations in the challenged system claims are merely generic. A17-18. The system claims at issue each contain the limitation "means for causing said future retirement payments to be deposited into said account." A35, Cl. 13; *see also* A36, Cl. 30 (reciting nearly the same claim limitation). The structure described in the specification corresponding that function is direct deposit using an electronic funds transfer system. A7; A32, col. 5, ll. 18-22. As the specification makes clear, electronic funds transfer systems are routine and conventional and add nothing of substance to the abstract underlying idea of advancing funds based on future retirement payments. A17-18; A32, col. 5, ll. 21-22. After *Alice*, simply claiming a machine is not enough. *See also, e.g., Plant Bingo, LLC v. VKGS LLC*, 576 Fed. Appx. 1005 at *1008 (Fed. Cir. 2014) (holding system and method claims patent-ineligible under section 101) (unpublished); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1351 (Fed. Cir. 2014) (holding computer-readable medium claims and method claims patent-ineligible under section 101).

### 3. No Additional Evidence Is Required to Determine That the Claims at Issue Are Directed to an Abstract Concept With Otherwise Routine Limitations

The Board also correctly rejected Retirement Capital's argument that specific evidentiary support must be considered to determine whether patent claims are directed to an abstract idea with merely conventional limitations. Br. 23, 33-

33; A13; A18-19.  First, Retirement Capital did not object to U.S. Bancorp's

characterization of the abstract concept at the Board hearing in this case. A13;

A337.  That issue accordingly is waived.  *In re Watts*, 354 F.3d 1362, 1367-68

(Fed. Cir. 2004).

In any event, this Court and the Supreme Court also have rejected the

argument that specific record evidence is required.  Both courts have affirmed

findings of patent-ineligibility under section 101 without citation to specific

evidence.  *See, e.g., Mayo,* 132 S. Ct. at 1302-05 (reversing a finding of patent-

eligibility for drug administration and analysis claims as directed to a law of

nature); *Ultramercial,* 772 F.3d at 713-15 (affirming dismissal on the pleadings of

claims directed to the abstract idea of showing an advertisement before delivering

free content); *Digitech Image Techs. LLC v. Electronics for Imaging, Inc.*, 758

F.3d 1344 (Fed. Cir. 2014) (affirming summary judgment that the claims were

directed to the abstract idea of a process of organizing information through

mathematical correlations).

This Court also explicitly addressed the present argument in *Content*

*Extraction*, but found it unavailing.  *Content Extraction*, 776 F.3d at 1349.  There,

the patent owner argued that the district court erred by dismissing the patent claims

as patent-ineligible under section 101 at the pleadings stage without construing the

claims or allowing the parties to conduct fact discovery or submit expert opinions.

40

*Id.* But this Court disagreed that those steps were necessary, and held that the claims were directed to the abstract idea of data collection, recognition, and storage. *Id.* at 1346-47. Without citing to specific evidence, the Court found that the concept of data collection, recognition, and storage is "indisputably well known" and that "banks have, for some time, reviewed checks, recognized relevant data such as the amount, account number, and identity of the account holder, and stored that information in their records."[14] *Id.*

Retirement Capital also argues that U.S. Bancorp could not meet its burden of proof at the Board because U.S. Bancorp did not supply specific evidence. Br. 25, 32. Retirement Capital further argues that Board cannot rely on common knowledge or common sense under the Administrative Procedure Act, and that this Court cannot affirm the Board's decision because doing so would require making factual determinations not made by the Board. Br. 25-26, 33-34.

But issues of patent-eligible subject matter are legal questions, as Retirement Capital admits. Br. 9; *see also, e.g., CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1369 (Fed. Cir. 2011). It would be a strange rule to require concrete proof of abstractness. Further, even if patent-eligibility questions are not

---

[14] Retirement Capital argues that the Supreme Court in *Bilski* and *Alice* cited to textbooks and journal articles to support its decisions that the claims at issue were abstract or represented a "fundamental economic practice." Br. 25. Yet the Court did not hold in in either case that such citations are required. *Alice*, 134 S. Ct. 2347; *Bilski*, 130 S. Ct. 3181.

purely legal, the Board simply took notice of non-technical facts not subject to reasonable dispute, which is a proper and long-standing practice.   A13; *see* Fed. R. Evid. 201 ("The court may judicially notice a fact that is not subject to reasonable dispute because it (1) is generally known . . . or (2) can accurately and readily be determined from sources whose accuracy cannot reasonably be questioned."); *In re Knapp-Monarch Co.,* 296 F.2d 230, 231-32 (C.C.P.A. 1961) (notice was properly taken that electric drink blenders are used as bar accessories).   The Administrative Procedure Act only requires that when the Board relies on "general knowledge" to negate patentability, "that knowledge must be articulated and placed on the record," as the Board did here in its decision.   *In re Lee*, 277 F.3d 1338, 1344-45 (Fed. Cir. 2002).   As the Board found, the '582 patent describes easily understandable, non-technical claims, for which additional evidence was not required.

Finally, Retirement Capital's challenge to the Board's determination that the claims' remaining limitations are merely conventional and routine also fails. Again, questions of patent-eligible subject matter are legal questions.   *See, e.g.*, *CyberSource Corp.*, 654 F.3d at 1369.   Further, as discussed in Section 4.C.I, *supra*, these limitations are generally known, and the written description of Retirement Capital's own patent repeatedly states that its claim limitations were conventional.   *See, e.g.,* A32, col. 5, ll. 1-5; A32, col. 5, ll. 56-59; A32, col. 5, ll.

19-21. It has long been established that admissions in a patent specification bind

its owner. *See, e.g.*, *In re Giegerich*, 396 F.2d 482, 485-86 (CCPA 1968).

> **4.    The Existence of Non-Infringing Alternatives Does Not Save an Otherwise Abstract Claim From Section 101**

Retirement Capital next argues that U.S. Bancorp's non-infringement

evidence shows that the challenged claims are patent-eligible under section 101

because they do not preempt all implementations of an abstract idea. Br. 26-32.

This Court has already rejected this assertion because it fundamentally

misperceives the Supreme Court's recent section 101 cases.

In *Alice*, the Supreme Court explained that adding generic or routine

limitations cannot impart patent eligibility. 134 S. Ct. at 2358. There may be

many generic limitations on abstract ideas, such that a defendant could avoid

infringement of any given set of claims. But, as the Court explained, those generic

limitations do not provide any "practical assurance that the process is more than a

drafting effort designed to monopolize the [abstract idea] itself." *Id.* at 2358; A20.

If patent applicants could obtain patents on different wholly generic

implementations of abstract ideas, then all the implementations of the idea would

be quickly preempted.

This Court adopted that reasoning in evaluating claims directed to

comparing BRCA sequences, finding that "[t]he preemptive nature of the claims is

not ameliorated even if we accept . . . [the] argument that other [unclaimed]

methods of comparison exist." *In re BRCA1- and BRCA2-Based Hereditary Cancer Test Patent Litigation*, 774 F.3d 755, 764 n. 4 (Fed. Cir. 2014). It explained, "If the combination of certain routine steps were patent eligible, so too would different combination of other routine steps." *Id.*

Similarly, in *Dealertrack*, the Court addressed the patent holder's argument that the claim was patent eligible because it covered the use of a clearinghouse only in the car loan application process, "and not all uses thereof." 674 F.3d at 1334. The Court held that, "[a]lthough directed to a particular use, it nonetheless covers a broad idea," explaining that, "[i]n *Bilski II*, the Supreme Court explained that the dependent claims were not patent eligible though they "limit[ed] an abstract idea to one field of use or add[ed] token post-solution components." *Id.* (citation omitted).

Finally, as the Board and this Court have held, parties are permitted to plead in the alternative, and an "assertion of non-infringement does not detract from [an] affirmative defense of invalidity under § 101." A20 (citing *Bancorp*, 687 F.3d at 1280).

### 5.    The Board Adequately Addressed All of the Claim Limitations

Last, Retirement Capital argues that the Board did not address two of the limitations of its claims. Br. 34-35. Retirement Capital contends that the Board did not discuss the limitation of basing the advance to the retiree "at least in part"

on the present value of the payments. *Id.* But this limitation is part of the core of the Board's analysis of abstractness, A13, and, in any event, it is well-known and conventional that factors other than present value (the time value of money) commonly bear on loan terms, as anyone who has applied for a mortgage or credit card knows. For example, credit risk (the creditworthiness and borrowing history of the applicant) typically affects the amount of money that a bank or other source of capital is willing to advance a given person or business.

Retirement Capital also argues that the Board did not address the limitation that the funding source may be reimbursed by the recipient from resources other than the retirement benefits if the benefits are curtailed. Br. 35. But this limitation is just the converse of the limitation that the retiree's benefits are not encumbered or assigned. Like any lender, the funding source could provide an unsecured loan (and seek repayment in court in the event of a default), or could ask for other security (a lien on a car, house, etc.).

## V.     CONCLUSION

For the foregoing reasons, the decision of the Board should be affirmed.

Respectfully submitted,

/s/Lore A. Unt
NATHAN K. KELLEY
*Solicitor*

SCOTT C. WEIDENFELLER
*Senior Counsel for Patent Law and
Litigation*

LORE A. UNT
STACY B. MARGOLIES
*Associate Solicitors*

Office of the Solicitor-Mail Stop 8
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, Virginia 22313

March 25, 2015                      *Attorneys for the Director of the
United States Patent and Trademark Office*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of March, 2015, I electronically filed

the foregoing CORRECTED BRIEF FOR INTERVENOR – DIRECTOR OF THE

UNITED STATES PATENT AND TRADEMARK OFFICE using the Court's

CM/ECF filing system.  Counsel for the parties was electronically served via e-

mail per Fed. R. App. P. 25 and Fed. Cir. R. 25(a) and 25(b).


/s/ Lore A. Unt
Associate Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

The brief contains 11,235 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

This brief has been prepared in a proportionally-spaced typeface using Microsoft® Office Word 2010 in fourteen-point Times New Roman font.

/s/ Lore A. Unt
Associate Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035